## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ALEXANDER M. DAISLEY,

          **Plaintiff,**

         **v.**

RIGGS BANK, N.A., et al.,

         **Defendants.**

Civil Action 03-01820  (HHK)

### MEMORANDUM OPINION

Plaintiff, Alexander Daisley, brings this action against Riggs Bank, N.A. ("Riggs") and its officer, Robert Roane (collectively, "bank defendants"), and against the United States Department of Treasury ("Treasury") and its employee, Jack McGuire (collectively, "federal defendants"). Daisley, a former employee of Riggs, was terminated in August 2001. He alleges that McGuire and Roane unlawfully conspired to orchestrate Daisley's termination, and brings additional claims against Roane for malicious intentional interference with employment relationship and for fraud; against both Riggs and Treasury for negligent hiring and supervision; and against Riggs for breach of contract, promissory estoppel, and for an accounting. Before the court are bank defendants' motion to dismiss [#3], and federal defendants' motion to dismiss or in the alternative for summary judgment [#10]. Upon consideration of these motions, the oppositions thereto, and the record of this case, the court concludes that federal defendants' motion must be granted, and bank defendants' motion must be granted in part and denied in part.

### I.    FACTUAL BACKGROUND

Alexander Daisley was employed by Riggs from May 24, 1999 to late August 2001. Compl. ¶¶ 39, 127. In 1988, Riggs had developed Treasury's "cash management application," known as CA$HLINK, *id*. ¶¶ 15-16, which Riggs operated with Treasury's Financial Management Service ("FMS"). *Id*. ¶¶ 12, 14. In 1996, Treasury began work on CA$HLINK II, an enhanced version of the original system, *id*. ¶¶ 13-16, and subsequently sought bids from "all

of the major US-based banks" to manage the project. *Id.* ¶ 12.  Daisley then worked for a business and technology consulting company which Riggs hired to assist with its CA$HLINK II bid, *id.* ¶¶ 10, 12, and during the bidding process he became acquainted with Riggs senior executives, including Timothy Lex, its then-Chief Operating Officer, and David Hoffman, its then-Chief Information Officer.  *Id.* ¶¶ 9, 18-21.  Although Riggs "made its initial employment overtures" to Daisley in December 1998, *id.* ¶ 23, these recruiting efforts intensified upon Treasury's selection of Riggs to run CA$HLINK II in February 1999. *Id.* ¶¶ 20, 23.  Daisley was initially reluctant to leave his previous position and home to work for Riggs, *id.* ¶¶ 25-26, but Hoffman and Lex assured him he would be guaranteed a "minimum six-year term of employment" as well as an "enhanced compensation package." *Id.* ¶¶ 26-28.  Daisley interviewed with Riggs executives, including Lex, and Hoffman, and the bank's then-Chief Executive Officer, in April 1999.  *Id.* ¶ 31.  After this visit, and the signing of the formal legal agreement between Treasury and Riggs for the development and management of CA$HLINK II in early May 1999, *id.* ¶ 35, Riggs presented Daisley with an offer letter "setting forth some, but not all, of the components of the verbal offers and commitments" Daisley had previously received from Lex and Hoffman.  *Id.* ¶ 36.  Daisley signed the offer letter, but "with the understanding that his term of employment was for a minimum of six years" and that he would receive the 'enhanced compensation package' he had previously discussed with Lex and Hoffman, *id.* ¶ 37.  He began work at Riggs on May 24, 1999, as Senior Vice President, and President of Riggs Enterprise Solutions.  *Id.* ¶ 39.  Lex resigned from Riggs that same day, replaced as Chief Operating Officer by Robert Roane.  *Id.* ¶ 40.

Daisley's new position placed him in regular contact with Treasury employees, including Jack McGuire of the FMS division, as Riggs began implementing CA$HLINK II.  *Id.* ¶ 41, 200. In the third quarter of 1999, Treasury issued its first change request.  *Id.* ¶ 41.  Daisley expressed concern that the change would force Riggs to bear higher costs than originally called for in its agreement with Treasury.  *Id.* ¶ 44.  He therefore negotiated on behalf of Riggs for Treasury to

absorb an additional $9,834,420 of the change request. *Id.* During and after these discussions, the relationship between Riggs and Treasury became strained, "primarily because Defendant Treasury did not want to pay more money to Defendant Riggs for CA$HLINK II Change Requests, even though these changes had been initiated by Defendant Treasury." *Id.* ¶ 46.

Treasury issued no fewer than twelve additional change requests for CA$HLINK II during the rest of Daisley's tenure with Riggs. *Id.* ¶¶ 69, 81-82, 89-90, 103. Upon each of these change requests, the relationship between Treasury and Riggs became increasingly antagonistic because of Treasury's resistance to paying for the related cost overruns. *Id.* ¶¶ 75, 93, 106. McGuire, for instance, told Daisley that "other banks worked for Treasury for free" and that he "did not understand why Riggs Bank would not do the same." *Id.* ¶ 113.

Daisley, however, successfully negotiated for Treasury to pay additional money for ten of the change requests. *Id.* ¶¶ 69, 81-82, 89-90. As a "direct result of [Daisley's] negotiations," Treasury's total costs for CA$HLINK II increased nearly $14,000,000 over its original commitment to Riggs. *Id.* ¶ 109. Daisley thus became the "proverbial 'thorn in the side' of Defendant Treasury" because he "resisted numerous efforts" by his Treasury counterparts to have Riggs bear costs for which Treasury had failed to budget. *Id.* ¶ 134.

Roane, on the other hand, took a more "conciliatory" approach towards Treasury. *Id.* ¶ 109. Because he had difficulty understanding the technical aspects of CA$HLINK II, Treasury staff easily "outmaneuvered" him, *id.* ¶¶ 52, 71, 110, and he acceded to Treasury's requests, even when the department refused to pay for its own change orders. *Id.* ¶¶ 103, 106, 108. Roane's approach established a "precedent" that Treasury personnel should try to "work around" Daisley in order to "achieve Defendant Treasury's aims." *Id.* ¶ 71.

Roane also came to resent both Daisley's technical expertise, *id.* ¶ 145-46, and his financial compensation from Riggs. *Id.* ¶ 71. As a result, Roane began to undermine Daisley's position with Treasury and sought to convince "representatives at Defendant Treasury that [Daisley] had to go." *Id.* ¶¶ 71, 74, 108, 122.

3

The "internal situation" at Treasury also presented difficulties for Daisley. *Id.* ¶ 111. Treasury lacked a sufficient number of employees with the technical skills necessary to manage CA$HLINK II, *id.*, forcing Daisley to deal with "incompetent and malicious officials at Defendant Treasury" such as McGuire and his supervisor, Ken Carfine. *Id.* ¶¶ 91, 207. As CA$HLINK II exceeded Treasury's budget, McGuire and other Treasury personnel became increasingly combative and "consistently challenged" Daisley. *Id.* ¶¶ 109-10, 115.

The department's budget woes led Treasury, with "input and prodding" from McGuire and Roane, to seek a "scapegoat" in Daisley. *Id.* ¶ 116. McGuire, like Roane, came to dislike Daisley and resent his technical skills. *Id.* ¶ 145-46. McGuire's technical inadequacies and failure to properly allocate funding led him to place the blame for CA$HLINK II problems outside of Treasury and with Daisley in particular. *Id.* ¶¶ 45, 112, 122, 145.

On July 27, 2001, following a dispute over CASHLINK II intellectual property ownership, Treasury demanded that Riggs remove Daisley from CA$HLINK II. *Id.* ¶¶ 120-22. Riggs' Chief Executive Officer, however, indicated that he would not take action regarding Daisley until after a CA$HLINK II business meeting between Riggs and Treasury then planned for September 12, 2001 ("FMS Summit"). *Id.* ¶ 125.

McGuire and Roane agreed to attack Daisley's performance at the FMS Summit. *Id.* ¶¶ 149-51. They arranged to advance the date of the FMS Summit to August 19, 2001, when Daisley was on vacation and could not be present to defend himself. *Id.* ¶ 148. They further agreed that McGuire would "take the lead" at the summit in criticizing Daisley. *Id.* ¶ 149. When Daisley returned from vacation, Roane advised him on August 30, 2001 that the FMS Summit had gone forward without him and had resulted in his "forced separation" from Riggs. *Id.* ¶ 128. This suit followed.

## II.   ANALYSIS

### A.   Legal Standard

A motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1)

should not be granted "unless plaintiffs can prove no set of facts in support of their claim that would entitle them to relief." *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (citing *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).  In ruling on a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the court should construe the plaintiff's complaint liberally, giving him the benefit of all favorable inferences that can be drawn from the alleged facts.  *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  Nonetheless, the plaintiff bears the burden of establishing the court's subject matter jurisdiction.  *Pitney Bowes, Inc. v. United States Postal Serv.*, 27 F. Supp. 2d 15, 19 (D.D.C. 1998).  Additionally, a court may consider such materials outside the pleadings as it deems appropriate to resolve the question of whether it has jurisdiction to hear the case.  *See, e.g.*, *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992); *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).

In deciding a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the court must construe the complaint in the light most favorable to the plaintiff and accept as true all reasonable inferences drawn from well-pleaded factual allegations.  *In re United Mine Workers of Am. Employee Ben. Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994).  Dismissal is not appropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).[1]

## B.     Claims

---

[1]     Ordinarily, when a defendant submits extrinsic evidence with a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the court must convert that motion into one for summary judgment.  *See Savage v. Scales*, 310 F. Supp. 2d 122, 129 (D.D.C. 2004).  However, where as here "a document is referred to in the complaint and [is] central to plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment."  *Lipton v. MCI Worldcom, Inc.*, 135 F. Supp. 2d 182, 186 (D.D.C. 2001) (citations omitted); *see also Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002).  Therefore, the court may consider the executed written offer letter signed by Daisley and a representative of Riggs without converting bank defendants' motion into a motion for summary judgment.

**1. Breach of Contract**

Under District of Columbia law, "the mutual promise to employ and serve creates a contract terminable 'at will' by either party." *Bell v. Ivory*, 966 F. Supp. 23, 29 (D.D.C. 1997) (citing *Sullivan v. Heritage Found.*, 399 A.2d 856 (D.C. 1979)).  Both employer and employee may terminate an at-will employment relationship "for any reason or no reason at all." *Wemhoff v. Investors Mgmt. Corp.*, 528 A.2d 1205, 1208 n.3 (D.C. 1987) (citing *Taylor v. Greenway Rest., Inc.*, 173 A.2d 211 (D.C. 1961)).  At-will employment should not be viewed as the absence of contract, but as a "species of contract," a principle "well settled" in the District of Columbia. *Sheppard v. Dickstein, Shapiro, Morin & Oshinsky*, 59 F. Supp. 2d 27, 32 (D.D.C. 1999) (citing *Rinck v. Ass'n of Reserve City Bankers*, 676 A.2d 12, 15 (D.C. 1996)).  Termination of employment, then, does not breach an at-will employment contract, because by its very terms the agreement contemplates that either party may end the employment relationship, with or without cause. *See Frazier v. Univ. of District of Columbia*, 742 F. Supp. 28, 29 (D.D.C. 1990) (dismissing breach of contract action because "the District of Columbia does not recognize wrongful discharge for an at-will employee.") (citations omitted).[2]

In the District of Columbia, absent express language indicating particular terms or duration of employment, the employment relationship is presumed to be at-will. *Carter v. George Washington Univ.*, 180 F. Supp. 2d 97, 109 (D.D.C. 2001) (citing *Sisco v. Gen. Servs. Admin.*, 689 A.2d 52, 53 (D.C. 1997); *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d

---

[2]     District of Columbia courts recognize a "very narrow exception to the at-will doctrine" in holding that "an employer engages in tortious conduct when it fires an at-will employee for that employee's refusal to break the law at the employer's direction." *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 34, 29 (D.C. 1991).  Although the courts have not created other public policy exceptions to date, they have evidenced a willingness to consider them on a case-by-case basis. *See Owens v. Nat'l Med. Care, Inc.*, 337 F. Supp. 2d 131, 137 (D.D.C. 2004) (discussing *Carl v. Children's Hosp.*, 702 A.2d 159 (D.C. 1997) (en banc)).  In addition, at-will employees "undoubtedly" may not be terminated for illegally discriminatory reasons, such as race or gender. *Alexis v. District of Columbia*, 44 F. Supp. 2d 331, 348 (D.D.C. 1999).  Daisley does not contend that Riggs terminated him either for his refusal to break the law or for illegally discriminatory reasons.

731, 745 (D.C. Cir. 1998)).  This presumption applies unless the parties "state clearly their

intention to limit the employer's right to terminate," *Taylor v. Wash. Metro. Area Transit Auth.*,

922 F. Supp. 665, 674 (D.D.C. 1996) (citation and internal quotation marks omitted), such as by

a contract provision setting out employment for a fixed term or language that allows termination

only for cause.  *See Hodge v. Evans Fin. Corp.*, 707 F.2d 1566 (D.C. Cir. 1983).

Here, the offer letter states that

> [a]t all times while you are employed by the Bank, either before or after completion of the Introductory Period, you will be employed 'at-will,' that is, your employment will continue only as long as it is mutually agreeable to you and the Bank.  Either you or the Bank may end the employment relationship at any time with or without cause or notice.  The 'at-will' nature of the employment relationship can only be changed by written agreement signed by you and the Director of Human Resources on behalf of the Bank.

Offer Letter at 3 (Bank Defs.' Mot. to Dismiss, Ex. A).

In order to rebut the presumption of at-will employment, and proceed with a cause of

action for wrongful discharge under a breach of contract theory, "a plaintiff must provide

evidence of clear contractual intent on the part of both the employer and the employee."  *Lance v.

United Mine Workers of Am. 1974 Pension Trust*, 355 F. Supp. 2d 358, 360 (D.D.C. 2005) (citing

*Choate v. TRW, Inc.*, 14 F.3d 74, 76 (D.C. Cir. 1994) (internal citations omitted)).  Against the

language of the offer letter, Daisley argues that it sets forth "some, but not all, of the components

of the verbal offers and commitments that [Daisley] had received" from Lex and Hoffman.

Compl. ¶ 36.  Specifically, Daisley alleges that the former Riggs executives offered him

"assurances of a minimum six-year term of employment," *id*. ¶ 27.  Daisley further contends that

Roane "subsequently reaffirmed Defendant Riggs' commitment to the six-year term of

[Daisley's] employment and the specific components of [Daisley's] enhanced compensation

package," and that Daisley himself "reaffirmed his acceptance of this oral agreement . . . ," *id*. ¶

164.  In other words, Daisley asserts that his employment with Riggs was not at-will.

"Where parties to a contract have executed a completely integrated written agreement, it

supersedes all other understandings and agreements with respect to the subject matter of the

agreement between the parties, whether consistent or inconsistent . . . ," *Masurovsky v. Green*, 687 A.2d 198, 202 (D.C. 1996) (citing *Howard Univ. v. Good Food Servs.*, Inc., 608 A.2d 116, 126-27 (D.C. 1992) (other citation omitted)); *see also Bowden v. United States*, 176 F.3d 552, 554 (D.C. Cir. 1999).

An "integrated" agreement, in turn, is "a writing or writings constituting a final expression of one or more terms of an agreement." RESTATEMENT (SECOND) OF CONTRACTS § 209(1) (1981); *see also Good Food*, 608 A.2d at 126 (an agreement is "completely integrated" if it is "adopted by the parties as the complete and exclusive statement of the terms of the agreement.") (quoting *Ozerol v. Howard Univ.*, 545 A.2d 638, 641 (D.C. 1988) (internal quotation marks omitted)). Determining whether an agreement is integrated requires examining "the intent of the parties at the time they entered into the agreement." *Piedmont Resolution, LLC, v. Johnston, Rivlin, & Foley*, 999 F. Supp. 34, 50 (D.D.C. 1998) (quoting *Good Food*, 608 A.2d at 126-27 (internal quotation omitted)).

Although Daisley asserts that he "signed the offer letter with the understanding that his term of employment was for a minimum of six years" and that his 'enhanced compensation package' "would be honored by Defendant Riggs for the minimum six-year term of employment," Compl. ¶ 37, such a statement does not establish his intent at the time of contracting for purposes of determining whether he has an actionable claim for breach of contract. *See Simard v. Resolution Trust Corp.*, 639 A.2d 540, 553 (D.C. 1994) ("[a]n employee's subjective belief that her employment is not terminable at will is not controlling . . . ."). Rather, "[t]he first and most important step in ascertaining that intent is examination of the contract itself," for 'if [a] document is facially unambiguous, its language should be relied upon as providing the best objective manifestation of the parties' intent.'" *Hercules & Co., Ltd. v. Shama Rest. Corp.*, 613 A.2d 916, 927 (D.C. 1992) (quoting *1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*, 485 A.2d 199, 205 (D.C. 1984) (other citation omitted)).

Daisley does not identify any relevant ambiguity in the offer letter. Although the offer

letter does not include a formal integration clause,[3] it clearly states that it "confirms our oral offer of employment," Offer Letter at 1, and that "[i]f there is any term of employment that we discussed that is not included in this letter, please contact [Patti Yoder, Riggs' Human Resources Director] immediately so we can include it.  If the offer *described in this letter* is acceptable, please sign below . . . ," *id*. (emphasis added).  Daisley's signature appears at the bottom of the page, dated May 7, 1999.  "Where the parties reduce an agreement to a writing which in view of its completeness and specificity reasonably appears to be a complete agreement, it is taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final expression."  Restatement (Second) of Contracts § 209(3) (1981).  Daisley does not allege any such "other evidence" that would undermine a reading of the offer letter as a completely integrated agreement.

Next, Daisley argues that even if the offer letter is found to be a fully integrated agreement, because "Roane confirmed Defendant Riggs' commitment to [Daisley] to employ him for a six-year term," Compl. ¶ 59, such "ratification constituted an oral modification of the offer letter."[4]  Opp'n at 11.  The mere oral promise of fixed-term employment, however, "is

---

[3]	A declaration in an agreement itself that the agreement is integrated is not conclusive, although it is certainly evidence of integration.  *See United States v. Basin Elec. Power Co-op*, 248 F.3d 781, 809 (8th Cir. 2003).  Rather, the central inquiry remains "the intent of the parties at the time they entered the agreement." *Masurovsky*, 687 A.2d at 202.

[4]	Bank defendants correctly point out that "modification of a contract normally occurs when the parties agree to alter a contractual provision or to include additional obligations, while leaving intact the overall nature and obligations of the original agreement."  *Hildreth Consulting Eng'rs, P.C. v. Knight, Inc.*, 801 A.2d 967, 974 (D.C. 2002).  The offer letter itself states that "[a]ny modifications to this Agreement must be made in writing and signed by both parties."  Offer Letter at 3.  It is well-settled in the District of Columbia, though, that "a written contract may be modified or rescinded by a subsequent oral agreement, even where the contract contains express language prohibiting oral modification."  *Puma v. Sullivan*, 746 A.2d 871, 875 (D.C. 2000) (citing *Nickel v. Scott*, 59 A.2d 206, 207 (D.C. 1948)).  This doctrine, however, does not salvage Daisley's breach of contract claim regarding his termination, because allegations of a "mere promise" of fixed-term or permanent employment are insufficient to rebut the presumption of at-will employment.  *See Willoughby v. Potomac Elec. Power Co.*, 100 F.3d 999, 1001 (D.C. Cir. 1996); *see also Fleming v. AT&T Info. Servs., Inc.*, 878 F.2d 1472, 1474-75 (D.C. Cir. 1989) (affirming district court's dismissal of breach of contract claim where plaintiff sought recovery based upon defendant employer's alleged assurances of long-term or lifetime employment).

9

insufficient to rebut the presumption of at will employment." *Willoughby v. Potomac Elec. Power Co.*, 100 F.3d 999, 1001 (D.C. Cir. 1996) (citing *Minihan v. Am. Pharm. Ass'n*, 812 F.2d 726, 728 (D.C. Cir. 1987); *Jankins v. TDC Mgmt. Corp.*, 21 F.3d 436, 443 (D.C. Cir. 1994); *Choate*, 14 F.3d at 77). Rather, a plaintiff bears the burden of alleging facts sufficient to show that "the parties intended that termination be subject to specific preconditions." *Wilson v. Prudential Fin.*, 332 F. Supp. 2d 83, 91, n.4 (D.D.C. 2004) (citing *Strass v. Kaiser Found. Health Plan of Mid-Atl.*, 744 A.2d 1000, 1011 (D.C. 2000); *see also Lance*, 355 F. Supp. 2d at 361). Because Daisley has not plead facts that would show that both parties intended to alter the presumption of at-will employment, he has no remedy in contract law for his termination. *Wilson*, 332 F. Supp. 2d at 92. The court, therefore, grants bank defendants' motion to dismiss Daisley's breach of contract claim as it applies to his termination from Riggs.

Daisley, however, also asserts a breach of contract claim over his 'enhanced compensation package,' alleging that notwithstanding his at-will status, he should still "receive the bonus amounts he was entitled to but never received as part of his enhanced compensation package for the period he was employed by Defendant Riggs, May 1999 through August 2001." Opp'n at 11, n.1. Bank defendants make no response to this argument.

The offer letter Daisley signed on May 7, 1999 provides terms for his compensation. Specifically, the offer letter establishes a starting annual salary of $200,000, which will "be reviewed periodically, usually on an annual basis, to determine whether an adjustment should be made." Offer Letter at 1. Additionally, the offer letter instructs Daisley that he "may be eligible for up to 100% of [his] base salary for exceeding agreed upon performance goals" specified in the letter, *id.* at 1-2; and provides that "we will recommend to the Board of Directors a Stock Option Grant of 25,000 options." *Id.* at 2. Daisley, however, alleges that Hoffman and Lex promised that he would be compensated on significantly different terms, Compl. ¶¶ 27-28, 50, and that

10

Roane, though initially "unaware" of Daisley's 'enhanced compensation,' subsequently "confirmed Defendant Riggs' commitment" to provide Daisley such compensation. *Id*. ¶¶ 58-59. Specifically, Daisley contends he in addition to his salary, during his employment with Riggs he was entitled to an annual bonus of up to 100% of his base salary "if defined performance objectives were met"; "annual salary increases of up to 10%" of the base salary; and an initial allocation of 25,000 stock options with a subsequent annual allocation of 10,000 stock options "if defined performance objectives were met." *Id*. ¶ 28.  While Daisley states that he received a $200,000 bonus shortly after his one-year anniversary with Riggs, *id*. ¶61, he asserts that he was improperly denied his bonus upon his two-year anniversary, *id*. ¶ 167; never received the $20,000 pay raise due him for his second year of employment with Riggs, *id*. ¶ 165; and did not receive the annual grant of 10,000 stock options, *id*. ¶¶ 166, 168, despite his successful completion of the agreed-upon performance objectives.  *Id*. ¶¶ 165, 167.

Notwithstanding an at-will employment agreement, an employee and employer may still contract regarding other terms, such as bonuses or stock options.  *See Terrell v. Uniscribe Professional Servs., Inc*., 348 F. Supp. 2d 890, 893 n.3 (N.D. Ohio 2004) ("At-will employees may enter into binding subsidiary contracts with their employers.").  Courts have found that an employee's at-will status does not prevent him from recovering for compensation owed to him for work performed during his period of employment.  *See Smith v. Chase Group, Inc.*, 354 F.3d 801, 807 (8th Cir. 2004) (citation omitted) (finding an oral contract for compensation between an employer and an at-will employee "sufficiently definite and certain" to create an obligation on behalf of the employer); *Livernois v. Med. Disposables, Inc.*, 837 F.2d 1018, 1023 (11th Cir. 1988) (citation omitted) ("an at-will employee may sue for any compensation that is due him under an oral contract, based on services actually performed by him up to the time of discharge.").  To the extent that Daisley pleads that he "received no compensation whatsoever for years four (except $33,898), five, and six because of his wrongful and premature termination," Compl. ¶ 170, he fails to state a claim for which relief can be granted.  His remaining breach of

11

contract claims regarding enhanced compensation, based upon Riggs' alleged modification of the offer letter, survive bank defendants' present motion.

### 2. Promissory Estoppel

Under District of Columbia law, to establish a promissory estoppel claim, the plaintiff must show (1) a promise; (2) that the promise reasonably induced reliance on it; and (3) that the promisee relied on the promise to her detriment. *Simard*, 639 A.2d at 552 (citing *Choate*,14 F.3d at 77). Promissory estoppel, however, is not available in all circumstances; District of Columbia law "presupposes that an express, enforceable contract is absent when the doctrine of promissory estoppel is applied." *Bldg. Servs. Co. v. Nat'l R.R. Passenger Corp.*, 305 F. Supp. 85, (D.D.C. 2004) (citing *Int'l Bus. Mach. Corp. v. Medlantic Healthcare Group*, 708 F. Supp. 417, 424 (D.D.C. 1989) (noting that "courts have held that an integrated written contract controls as against any and all prior inconsistent oral agreements or promises; such a contract nullifies the effect that promissory estoppel might otherwise have.")).

This principle enjoys near-universal acceptance in American jurisdictions. *See, e.g.*, *Carlson v. Arnot-Ogden Mem'l Hosp.*, 918 F.2d 411, 416 (3d Cir. 1990); *Jhaver v. Zapata Off-Shore Co.*, 903 F.2d 381, 385, n.11 (5th Cir. 1990); *APJ Assocs., Inc. v. N. Am. Philips Corp.*, 317 F.3d 610, 617 (6th Cir. 2003); *All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 869 (7th Cir. 1999) ("when there is an express contract governing the relationship out of which the promise emerged, and no issue of consideration, there is no gap in the remedial system for promissory estoppel to fill."). In other words, "[p]romissory estoppel is not a legal doctrine designed to give a party to a negotiated commercial bargain a second bite at the apple in the event it fails to prove breach of contract." *Walker v. KFC Corp.*, 728 F.2d 1215, 1220 (9th Cir. 1984). Because "a party may not assert a promissory estoppel claim where there is an enforceable contract," *Bynum v. Equitable Mortg. Group*, 2005 WL 818619 at *16 (D.D.C. Apr. 7, 2005), the

court dismisses Daisley's promissory estoppel claim.[5]

### 3. Intentional Interference with Employment Relationship

To state a claim for intentional interference with an employment relationship in the District of Columbia, the plaintiff must show (1) the existence of an employment contract; (2) defendant's knowledge of the contract; (3) defendant's intentional procurement of the breach of the contract; and (4) damages. *Sorrells v. Garfinckel's*, 565 A.2d 285, 289 (D.C. 1989).

Here, Daisley asserts a claim against Roane for "malicious and intentional interference with [Daisley's] employment relationship with Defendant Riggs," Compl. ¶ 143, which led to Daisley's termination. Daisley alleges that his enhanced compensation package triggered the jealousy of Roane, *id*. ¶ 130, who "then set out to make [Daisley] the scapegoat for all problems relating to CA$HLINK II," *id*. ¶ 132. More specifically, Roane allegedly acquiesced to Treasury's change orders and cost overruns, while simultaneously pressuring Daisley to take a more confrontational position, so that Treasury "would eventually come to perceive [Daisley] as Defendant Riggs' offensive and obnoxious point man and seek [his] removal from the CA$HLINK II project altogether." *Id*. ¶ 133. Additionally, Daisley claims that "Roane advanced the date of the 'FMS Summit' and secured [Daisley's] 'forced separation' while [Daisley] was away on vacation with his family." *Id*. ¶ 140.

Bank defendants argue that Daisley cannot recover on this claim because "under an at-will arrangement the prerequisite does not exist for the tort of interference with employment relationship." *Dale v. Thomason*, 962 F. Supp. 181, 184 (D.D.C. 1997). *Dale* based its holding on a D.C. Court of Appeals case decided the previous year, *Bible Way Church of Our Lord Jesus Christ of the Apostolic Faith of Wash. v. Beards,* 680 A.2d 419 (D.C. 1996). In that case, the

---

[5]     Furthermore, reliance on a promise cannot be reasonable when it is completely at odds with the terms of a written agreement covering the same transaction. *See In re U.S. Office Prods. Co. Sec. Litig.,* 251 F. Supp. 2d 77, 97-98 (D.D.C. 2003) (reliance on oral statements unreasonable when such statements contradicted terms of, and were not incorporated into, the written agreement).

court determined that because the plaintiff was employed at-will, she had "no basis for either a breach of contract or tortious interference with contract claim" against her employer. *Id.* at 433.

A subsequent D.C. Court of Appeals case confirmed this conclusion, finding it "clear" that as an at-will employee, the plaintiff "did not have a contractual employment relationship she could use as the basis for a suit for tortuous [sic] interference with a contractual relationship" against her former employer and managers. *McManus v. MCI Communications Corp.*, 748 A.2d 949, 957 (D.C. 2000). *McManus* also extended the reasoning of *Bible Way* to the tort of interference with prospective employment relations, finding that "this court has never held that an employee can maintain a suit for interference with prospective advantage where her expectancy was based on an at-will relationship, and we do not do so now." *Id.* *McManus* went on to note that even if the plaintiff did have a cognizable claim for interference with a prospective employment relationship, she could not prevail against her supervisor because "the law affords to a supervisor . . . a qualified privilege to act properly and justifiably toward a fellow employee and that employee's true employers – those who have the power to hire and fire." *Id.* at 958 (quoting *Sorrells*, 565 A.2d at 291). *Bible Way* and *McManus* foreclose the possibility that Daisley, as an at-will employee, can recover from his former employer or former supervisor for intentional interference with employment relations, either on the basis of existing contract or prospective advantage.[6]

---

[6]     *Dale* interpreted *Bible Way* to hold that "[a] third party who interferes with such a tenuous relationship [at-will employment] is not liable to the employee since no wrongful breach of contract can result from his interference."  962 F. Supp. at 184.  *Dale*, however, overstates the scope of *Bible Way*, which only blocked an employee's suit against her employer.  While *McManus* went further, barring an intentional interference suit against the employee's supervisors, and denying a claim based on prospective as well as current contractual relations, this court notes that the question of whether an at-will employee may recover against a third party unrelated to the employer has not been clearly resolved by courts in this jurisdiction.  The Supreme Court has indicated that "third-party interference with at-will employment relationships" has "long been a compensable injury under tort law."  *Haddle v. Garrison*, 525 U.S. 121, 126 (1998) (citing Thomas Cooley, 2 Law of Torts 589-591 (3d ed. 1906); *Truax v. Raich*, 239 U.S.33, 38 (1915) ("The fact that the employment is at the will of the parties, respectively, does not make it one at the will of others . . . the unjustified interference of third persons is actionable although the employment is at will."); W. Keeton et al., Prosser and

**4. Civil Conspiracy**

*a. against Roane*

The tort of civil conspiracy has four elements: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme."  *Griva v. Davison*, 637 A.2d 830, 848 (D.C. 1994) (citing *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)).  However, "[t]here is no recognized independent tort action for civil conspiracy in the District of Columbia."  *Waldon v. Covington*, 415 A.2d 1070, 1074 (D.C. 1980) (citing *Lamont v. Haig*, 590 F.2d 1124, 1136 n.73 (D.C. Cir. 1978)).  Rather, recovery under a theory of civil conspiracy "is a means for establishing vicarious liability" for "some underlying tortious act."  *Weishapl v. Sowers*, 771 A.2d 1014, 1023-24 (D.C. 2001) (quoting *Griva*, 637 A.2d at 848).  Performance of the underlying tort, pursuant to an agreement, gives rise to a civil conspiracy claim.  *Halberstam*, 705 F.2d at 479; *see also Riggs v. Home Builders Inst.*, 203 F. Supp. 2d 1, 25-26 (D.D.C. 2002) (plaintiff stated a claim for civil conspiracy under District of Columbia law when he pled a cognizable underlying tort).  Because the court dismisses Daisley's intentional interference with employment claim, there is no longer an "underlying tortious act" to support his claim of civil conspiracy against Roane.

*b. against McGuire*

As for Daisley's civil conspiracy claim against McGuire, the court concludes that it does not have jurisdiction to consider such a claim.  Even assuming *arguendo* that Daisley could establish that he was not an at-will employee, allowing his intentional interference with employment relations claim to survive dismissal, he could not use an interference with

---

KEETON ON LAW OF TORTS § 129, pp. 995-96, n.83 (5th ed. 1984)); *see also Worrell v. Henry*, 219 F.3d 1197, 1214 n.4 (10th Cir. 2000) ("an at-will employee who has no wrongful termination action against his employer may still be able to assert an intentional interference claim against a third party.").

employment claim as the basis for the civil conspiracy claim against McGuire. This is because the court determines that since McGuire was acting in the scope of his employment at the time of the alleged conspiracy, the proper defendant is the United States, not McGuire; and because under the Federal Tort Claims Act ("FTCA") the United States has not waived its sovereign immunity for "[a]ny claim arising out of … interference with contract rights." 28 U.S.C. § 2680(h).

### i. "acting within the scope of employment"

The Federal Employees Liability Reform and Tort Compensation Act ("Westfall Act"), 28 U.S.C. § 2679(b)(1), provides that a federal employee acting within the scope of employment is immune from state tort suits for money damages.[7] *See Stokes v. Cross*, 327 F.3d 1210, 1213 (D.C. Cir. 2003); *Haddon v. United States*, 68 F.3d 1420, 1423 (D.C. Cir. 1995). A plaintiff's only recourse is to proceed under FTCA against the United States, *Haddon*, 68 F.3d at 1423, which is substituted as a party defendant upon certification by the Attorney General that a federal employee was acting within the scope of employment at the time of the alleged claim.[8] This certification, however, is not conclusive. *Stokes*, 327 F.3d at 1213 (citing *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 434 (1995). Instead, the district court may determine independently whether the employee was acting within the scope of employment and, therefore, whether substitution is proper. *Stokes*, 327 F.3d at 1213-14; *Haddon*, 68 F.3d at 1423. Here, the Chief of

---

[7]     28 U.S.C. § 2679(b)(1) provides that "[t]he remedy against the United States provided by sections 1346(b) and 2672 of this title for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim or against the estate of such employee."

[8]     28 U.S.C. § 2679(d)(1) provides that "[u]pon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant."

the Civil Division of the United States Attorney's Office for the District of Columbia has certified that McGuire was acting within the scope of his employment with the Treasury during the incidents alleged in Daisley's complaint. Fed. Defs.' Mot. to Dismiss at 5 n.2; Certification of Mark Nagle.

Daisley has requested discovery and an evidentiary hearing regarding McGuire's scope of employment. Opp'n (Fed. Defs.') at 5-6. In order to obtain discovery and an evidentiary hearing, however, he must "raise a material dispute regarding the substance" of the certification by "alleging facts that, if true, would establish that the defendant[] [was] acting outside the scope of [his] employment." *Stokes*, 327 F.3d at 1215. The district court does not err in dismissing a claim against an employee prior to discovery where the plaintiff "did not allege any facts in his complaint or in any subsequent filing … that, if true, would demonstrate that [the defendant] had been acting outside the scope of his employment." *Id.* at 1216 (citing *Singleton v. United States*, 277 F.3d 864, 871 (6th Cir. 2002)); *see also Caesar v. United States*, 258 F. Supp. 2d 1, 4 (D.D.C. 2003) ("If the Court may independently determine, taking all of the allegations of the Complaint as true, and making all reasonable factual inferences in the plaintiff's favor, that, as a matter of law, the alleged tortfeasor was acting within the scope of her employment when plaintiff was injured, then no evidentiary hearing is required.").

Daisley's complaint does not contain sufficient factual allegations to warrant discovery on the scope of employment question. State law governs the scope of employment determination. *See*, *e.g.*, *Stokes*, 327 F.3d at 1215. Here, the court must apply District of Columbia law, which is based on the Restatement (Second) of Agency. *See id.*; *Haddon*, 68 F.3d at 1423. Under D.C. law, conduct of a servant is within the scope of employment if (1) "it is of the kind he is employed to perform"; (2) "it occurs substantially within the authorized time and space limits"; (3) "it is actuated, at least in part, by a purpose to serve the master"; and (4) "if force is intentionally used by the servant against another, the use of force is not unexpected by the

17

master." [9]  *Hechinger Co. v. Johnson*, 761 A.2d 15, 24 (D.C. 2000) (quoting RESTATEMENT

(SECOND) OF AGENCY §228 (1957)).  Applying this standard, and assuming the truth of Daisley's

factual allegations, the court concludes that McGuire was acting within the scope of employment

when he allegedly conspired to have Daisley terminated from Riggs.

    First, Daisley's own allegations indicate that McGuire's conduct was of the kind he was

employed to perform.  To satisfy this first prong of the Restatement, McGuire's actions must be

"of the same general nature as that authorized" or "incidental to the conduct authorized."  *See*

*Haddon*, 68 F.3d. at 1424 (quoting RESTATEMENT (SECOND) OF AGENCY §229 (1957)).

According to the D.C. Court of Appeals, an employee's conduct is "incidental" to his authorized

duties if it is "foreseeable," meaning it was "a direct outgrowth of the employee's instructions or

job assignment."  *Id.*  (quoting *Boykin v. District of Columbia*, 484 A.2d 560, 562 (D.C. 1984)).

    Under District of Columbia law, the alleged tort does not have to be explicitly sanctioned

by the employer for the employee's conduct to be of the kind he was employed to perform.

Rather, the conduct need only have directly arisen from the employee's authorized duties, such as

a dispute involving a work assignment.  *See Lyon v. Carey*, 533 F.2d 649, 652-53 (D.C. Cir.

1976); *Weinberg v. Johnson*, 518 A.2d 985, 990-92 (D.C. 1986) (*Johnson II*); *Johnson v.*

*Weinberg* (*Johnson I*), 434 A.2d 404, 408-09 (D.C. 1981).

    Here, the complaint indicates that the animosity between Daisley and McGuire arose

directly from the tense working relationship between their respective employers.  Through

Daisley's persistence, Treasury was forced to bear an additional $14,000,000 in costs.  Compl ¶

109.  As a result of his efforts on behalf of Riggs, Daisley alleges that "[d]efendant McGuire and

*other personnel* at Defendant Treasury gratuitously and consistently challenged Plaintiff . . . ," *id.*

¶ 115 (emphasis added).[10]  Additionally, Daisley avers that Treasury requested his removal from

---

[9]    The Restatement's fourth prong, involving the use of force by the employee, is clearly
inapplicable to Daisley's complaint.

[10]    Daisley makes similar allegations elsewhere.  *See* Compl. ¶ 71 (Roane was "consistently
outmaneuvered by Defendant Treasury *personnel*" and that Roane's approach "established a

the CA$HLINK project prior to McGuire's alleged conduct involving the FMS Summit.  *Id.* ¶

122.  As described by Daisley, McGuire's hostility was shared by others at Treasury, and

emerged from their work-related conflicts with Daisley.[11]  Accordingly, the first part of the scope-

of-employment test is satisfied.

Second, McGuire's alleged conduct occurred "substantially within the authorized time

and space limits."  *See* RESTATEMENT (SECOND) OF AGENCY §228 (1957).   This prong of the

Restatement's scope-of-employment test is satisfied when the alleged tort was committed while

the employee was working.  *See Konarski v. Brown*, 293 F. Supp. 2d 70, 73 (D.D.C. 2003);

*Caesar*, 258 F. Supp. 2d at 5.  In this case, McGuire's alleged conspiracy to have Daisley

terminated was planned in the course of work-related communications, and was executed at the

FMS Summit, a business meeting attended by officials from Treasury and Riggs bank.

Accordingly, his alleged actions fall within the RESTATEMENT's time and space requirement.

Third, Daisley's allegations indicate that McGuire was motivated at least in part by a

desire to serve Treasury.  *See* RESTATEMENT (SECOND) OF AGENCY §228 (1957).  Daisley's

assertions that McGuire wanted him removed because of McGuire's alleged concern with his

---

precedent at Defendant Treasury to 'work around' Plaintiff to achieve Defendant Treasury's aims"); *id.* ¶ 109 ("*representatives* from Defendant Treasury consistently sought to by-pass [Daisley] and deal directly with Roane because [Roane] … constantly capitulated to Defendant Treasury's demands"); *id.* ¶ 122 (Roane ultimately achieved his goal of "convincing *representatives* at Defendant Treasury that Plaintiff had to go"); *id.* ¶ 134 (Daisley "resisted numerous efforts by *representatives* of Defendant Treasury to saddle Defendant Riggs with inflated costs" that Treasury had failed to budget); *id.* ¶ 203 ("*representatives* from Defendant Treasury, *including Defendant McGuire and Mr. Carfine*, did not understand some basic principles of the CA$HLINK II arrangement and, in order to cover up their own missteps, requested that Defendant Riggs absorb specific Build costs that Defendant Treasury was clearly responsible for") (emphases added).

[11]     Accordingly, this case is distinguishable from *Haddon*, which Daisley cites in support of a determination that McGuire was acting outside the scope of employment.  68 F.3d at 1425-26. In that case, the court concluded that the defendant's conduct was "completely unrelated to his official responsibilities" because the threat stemmed from a dispute (an EEOC complaint involving the plaintiff and another employee) that did not concern *his* employment.  *Id.* at 1425. Here, in contrast, McGuire's alleged acts stem from his work for the Treasury on CA$HLINK II and by Daisley's admission directly relate to the financial disputes he had with Daisley involving this project.

own incompetence and job security, *see* Compl. ¶¶ 112, 115, 147, do not establish that McGuire was acting outside of the scope of his employment.  District of Columbia scope-of-employment law is "broad enough to embrace any intentional tort arising out of a dispute that 'was originally undertaken on the employer's behalf.'"  *Stokes*, 327 F.3d at 1216 (quoting *Johnson II*, 518 A.2d at 992 (citations omitted)).  Thus, while the District of Columbia excludes from the scope of employment "all actions committed *solely* for the servant's own purposes," an employer is liable for the employee's intentional tort, if the tort is committed "*partially* because of a personal motive [of the employee], such as revenge, as long as the employee is actuated, *at least in part*, by a desire to serve his principal's interests."  *Johnson II*, 518 A.2d at 988, 990 (internal quotation marks, alterations, and citations omitted) (emphases added).

Daisley maintains that Treasury wanted to avoid additional CA$HLINK II costs and that Treasury employees regularly tried to limit their contact with him in order to achieve this aim.  Compl. ¶¶ 71, 109, 134.  Thus, McGuire's alleged attempt to have Daisley removed from CA$HLINK II closely relates to his employer's business and objectives.  In addition, Daisley indicates that, whatever personal enmity McGuire allegedly had towards him, McGuire also advocated Treasury's interest.  According to Daisley, McGuire contested Daisley's efforts to have Treasury pay for the CA$HLINK II change requests, telling him that "other banks work for Treasury for free" and that he (McGuire) "did not understand why Riggs Bank would not do the same."  Compl. ¶ 113.  Since McGuire's allegedly tortious conduct was connected to a dispute involving his employer's business, and in accord with his employer's interest, the court concludes that his alleged actions were undertaken at least in part to serve Treasury.

Thus, under District of Columbia law, McGuire's conduct, as described by Daisley, was within the scope of his employment with the Treasury.  Accordingly, discovery and an evidentiary hearing on the scope of employment issue are unwarranted, and the United States' certification must be given effect.  McGuire must be dismissed from the case and the United States substituted as defendant for McGuire on the civil conspiracy claim.  *See, e.g.*, *Koch*, 209 F.

20

Supp. 2d at 93 (substituting the United States as defendant and dismissing the federal employee after concluding, as a matter of law that the employee was acting within the scope of his employment); *Hosey v. Jacobik*, 966 F. Supp. 12, 15 (D.D.C. 1997). Since the court has determined that the civil conspiracy claim must be brought against the United States under FTCA, it must next consider whether the United States has waived its sovereign immunity for suits of this nature.

### ii. no liability absent waiver of sovereign immunity

The United States is immune from tort liability absent an express waiver of sovereign immunity. *See United States v. Sherwood*, 312 U.S. 584, 586 (1941). This waiver must define the terms of the United States' consent and establish the court's jurisdiction to entertain the suit. *See id.* Under FTCA, the United States may be held liable "for injury or loss of property, or personal injury or death" caused by a government employee "where . . . a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred" under similar circumstances. 28 U.S.C. § 1346(b); *see also* 28 U.S.C. § 2674 (providing that the United States will be liable for tort claims "to the same extent as a private person under like circumstances"); *Art Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151, 1157-58 (D.C. Cir. 1985). FTCA's waiver of sovereign immunity is also subject to a number of exceptions. *See* 28 U.S.C. § 2680. If an exception applies, sovereign immunity is not waived and the court lacks subject matter jurisdiction over the case. *See Sloan v. United States Dep't of Housing and Urban Dev.*, 236 F.3d 756, 759 (D.C. Cir. 2001).

### iii. no waiver of sovereign immunity for interference with contract rights

The FTCA provides that the United States' sovereign immunity is not waived as to "any claim arising out of . . . interference with contract rights." 28 U.S.C. § 2680(h). This jurisdiction has interpreted this exception the FTCA's waiver of sovereign immunity to encompass claims for interference with employment. *See United States Info. Agency v. Krc*, 989 F.2d 1211, 1216 (D.C. Cir. 1993) (claim for intentional interference with prospective employment opportunities arises

out of interference with contract rights and therefore is barred by sovereign immunity under FTCA); *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98-99 (D.D.C. 1999) (claim for intentional interference with employment arises out of interference with contract rights and therefore is barred by sovereign immunity under FTCA); *Art-Metal U.S.A.*, 753 F.2d at 1154-55 (finding that a claim for interference with prospective economic advantage arises from interference with contract rights because it involves interference in an economic relationship between two parties, and noting that interference with contracts in existence or subject to future creation falls within the exception).  Daisley's civil conspiracy claim against McGuire therefore rests upon an underlying tort for which the United States has not waived its sovereign immunity.  *See* 28 U.S.C. § 2680(h).  This court must therefore dismiss the civil conspiracy claim against McGuire for lack of subject matter jurisdiction.

### 5. Fraud

At common law, the requisite elements of fraud are: (1) "a false representation (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation," and "at least in cases involving commercial contracts negotiated at arm's length there is the further requirement (6) that the defrauded party's reliance be *reasonable*."  *Hercules*, 613 A.2d at 923 (internal citations omitted).

Under Fed. R. Civ. P. 9(b), "the circumstances constituting fraud or mistake shall be plead with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally."  The circumstances of the fraud that generally must be plead with specificity are "the time, place, and content" of the misrepresentations, "the misrepresented fact, and what the opponent retained or the claimant lost as a consequence of the alleged fraud." *United States ex rel. Fisher v. Network Software Assocs.,* 227 F.R.D. 4, 9 (D.D.C. 2005) (citing *United States ex rel. Totten v. Bombardier Corp.,* 286 F.3d 542, 551-52 (D.C. Cir. 2002) (other citation omitted)).  "The concealment of a fact that should have been disclosed" may also

constitute fraud, *Sage v. Broadcasting Publ'ns, Inc.,* 997 F. Supp. 49, 52 (D.D.C. 1997) (citing *Feltman v. Sarbov*, 366 A.2d 137, 140-41 (D.C. 1976)), "especially where there is a duty to disclose." *Pyne v. Jamaica Nutrition Holdings Ltd.*, 497 A.2d 118, 131 (D.C. 1985) (internal citations omitted); *Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C. 1977), *cert. denied*, 434 U.S. 1034 (1978) (non-disclosure or silence may constitute fraud).

The springboard for Daisley's fraud claim is his allegation that in April 2000 Roane "initiated discussions with [Daisley] about an alleged 'promotion'" from Senior Vice President to Executive Vice President.  Compl. ¶ 172.  According to Daisley, Roane presented this change in position as a promotion, knowing that the change "was in realty a demotion . . . in that it materially and adversely impacted the terms of [Daisley's] enhanced compensation package." *Id*. ¶ 174.  Daisley further states that Roane misrepresented the alleged 'promotion'. . . by his failure to disclose to [Daisley] that as an Executive Vice President, [Daisley] would not be entitled to his enhanced compensation package as a matter of internal policy at Defendant Riggs." *Id*. ¶ 176. Roane allegedly "revealed this deception" ten months after the purported promotion. *Id*. ¶ 178.

Bank defendants first contend that Daisley has failed to plead fraud with the requisite particularity.  Bank Defs.' Mot. to Dismiss at 16-17.  The court disagrees.  Fed. R. Civ. P. 8, which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," should be read "in conjunction" with Rule 9(b). *Kowal*, 16 F.3d at 1278.  Rule 9(b)'s requirements ensure that defendants have notice of a fraud claim sufficient to provide a meaningful response. *See Network Software Assocs.*, 227 F.R.D. at 9.  However, when a plaintiff "describe[s] the nature of the alleged misrepresentations, the general time frame in which they were made, and the parties involved," as Daisley does here, his failure to "specify the exact time and particular place of each misrepresentation or omission" will not mandate dismissal of his claim. *Towers Fin. Corp. v. Solomon*, 126 F.R.D. 531, 535 (N.D. Ill. 1989).  Daisley's complaint includes the subject matter of the alleged misrepresentation, identifies which defendant allegedly made the misrepresentation, and attributes the misrepresentation to a particular period of time.

23

He has thus provided sufficient information, as contemplated by Rule 9(b), to give defendants "adequate notice of the specifics" of Daisley's fraud claim. *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 74 (D.D.C. 2002).

Second, bank defendants argue that Daisley has "failed to allege any duty to speak" on the part of Roane. Bank Defs.' Mot. to Dismiss at 17. Bank defendants cite *Brown v. Dorsey & Whitney, LLP* for the proposition that "[a]n employer/employee relationship is not a fiduciary relationship upon which a fraudulent concealment action can spring." 267 F. Supp. 2d 61, 80 (D.D.C. 2003) (quoting *Hooters of Am., Inc. v. Phillips*, 39 F. Supp. 2d 582, 607 (D.S.C. 1998)). In *Dorsey & Whitney*, however, the plaintiff argued that the defendant employer had an affirmative obligation to make sure that the plaintiff read and understood the employer's dispute resolution policy. Here, in contrast, Daisley instead alleges that Roane deliberately "made a false representation when he conferred a 'promotion'" on Daisley. Pl.'s Opp'n (Bank Defs.) at 12. Furthermore, because "the existence of a fiduciary relationship is a fact-intensive question, involving a searching inquiry into the nature of the relationship, the promises made . . . and the legitimate expectations of the parties," *Firestone v. Firestone*, 76 F.3d 1205, 1211 (D.C. Cir. 1996) (citation omitted), Daisley's fraud claim is not amenable to dismissal at this time.

### 6. Negligent Hiring/Supervision

#### a. against Riggs

The torts of negligent hiring and supervision are actionable in the District of Columbia. *See Tarpeh-Doe v. United States,* 28 F.3d 120, 123 (D.C. Cir. 1994); *Phelan v. City of Mt. Rainier,* 805 A.2d 930, 937 (D.C. 2002). As with any negligence action, the plaintiff must show that in its hiring or supervision, the defendant breached an applicable duty of care, causing injury to the plaintiff. *See id*. at 938 (citations omitted). In addition, to establish a cause of action for negligent supervision, a plaintiff must show: (1) that the employer "knew or should have known its employee behaved in a dangerous or otherwise incompetent manner," and (2) that the employer, "armed with that actual or constructive knowledge, failed to adequately supervise the

employee." *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985) (emphasis omitted); *see also Ryczek v. Guest Servs., Inc.*, 877 F. Supp. 754, 764 (D.D.C. 1995) (granting summary judgment for defendant in absence of evidence to "suggest that [defendant] knew or should have known about any improper activity or that [defendants'] negligence caused damages to the plaintiff.")

Here, Daisley contends that Riggs "had a duty and obligation to provide [him] with qualified professionals" to assist him, Compl. ¶ 193, and that placing him under Roane's supervision "constituted a breach of [this] duty," *id.* ¶ 196, since Roane "lacked the requisite knowledge and experience to supervise [Daisley]." *Id.* In response, bank defendants argue that this claim must be dismissed because "[t]he District of Columbia, like many states, requires that the alleged injury in a negligent supervision or hiring case be a physical injury." Bank Defs.' Mot. to Dismiss at 19. Despite a thorough review of caselaw, the court has not located any support for this sweeping proposition.

In some jurisdictions, physical injury is a clearly established requirement for recovery under a negligent hiring or negligent supervision theory. *See Monte v. Ernst & Young LLP,* 330 F. Supp. 2d 350, 365 (S.D.N.Y. 2004) ("negligent hiring/retention claims are usually sustained only where a plaintiff has suffered significant physical injury."); *St. Hilaire v. Minco Prods., Inc.*, 288 F. Supp. 2d 999, 1010 (D. Minn. 2003) ("to maintain an action for either negligent retention or negligent supervision, the existence of a threat, or reasonable apprehension of actual physical injury is required.") (citations and internal quotation marks omitted); *Parker v. Geneva Enters., Inc.*, 997 F. Supp. 706, 713 (E.D. Va. 1997) (interpreting an element requiring that the hiring involve an "unreasonable risk of harm to others" as requiring "the threat of serious and significant physical injury.").

In contrast, courts in other jurisdictions have explicitly stated that an allegation of physical injury is *not* required for a negligent hiring or supervision claim. *See Kiesau v. Bantz*, 686 N.W. 2d 164, 172 (Iowa 2004) (finding "no requirement that an injured party must sustain physical injury to recover under a claim of negligent hiring, supervision, or retention" and

directly overruling a prior case that held otherwise); *Grego v. Meijer, Inc.*, 187 F. Supp. 2d 689, 694 (W.D. Ky. 2001) ("the tort of negligent supervision does not necessarily derive from employees' torts that cause physical injury"); *Verhelst v. Michael D's Rest. San Antonio, Inc.*, 154 F. Supp. 2d 959, 968 (W.D. Tex. 2001) ("a cause of action for negligent supervision and training requires that the employee in question commit an actionable tort, causing a 'legally compensable injury' – not necessarily a physical injury."); *Van Horne v. Muller*, 691 N.E. 2d 74, 80 (Ill. App. Ct.), *rev'd in part on other grounds by* 705 N.E. 2d 898 (Ill. 1998) ("just because physical injury has been alleged in previous cases does not mean that such an allegation is a prerequisite to stating a cause of action" under negligent hiring).

Additional courts have *implicitly* recognized that a valid claim for negligent supervision may be predicated upon tortious acts that do not necessarily result in physical injury.  *See Hays v. Patton-Tully Transp. Co.,* 844 F. Supp. 1221, 1223 (W.D. Tenn. 1993) ("a negligent supervision claim will lie in a sexual harassment case if supported by a viable claim of tortious conduct," such as "battery or intentional infliction of emotional distress"); *Mendes v. Jednak*, 92 F. Supp. 2d 58, 63 (D. Conn. 2000) (an employer may be liable for negligent hiring if the employer knew or should have known that the harm the plaintiff suffered "was likely to result from [the employer's] conduct").

In the District of Columbia, no court has spoken directly to this issue.[12]  In the absence of conclusive authority, the court will not graft a physical injury requirement onto the tort of

---

[12]    Bank defendants cite to *Morgan v. Psychiatric Inst. of Wash.*, 692 A.2d 417, 423 (D.C. 1997), to support their claim that physical injury is a prerequisite for recovery under a negligent hiring or supervision theory.  In that case, the D.C. Court of Appeals overturned the trial court's grant of summary judgment to the defendants on several of the plaintiff's claims, including negligent hiring or supervision and negligent infliction of emotional distress, because the plaintiff's alleged injuries, "if proven, satisfied the legal requirement for physical injury in a claim for negligent infliction of emotional distress."  *Id*.  The *Morgan* court's apparent borrowing, without analysis, of the physical injury requirement from the tort of negligent infliction of emotional distress hardly demonstrates that the District of Columbia "requires that the alleged injury in a negligent supervision or hiring claim be a physical injury."  Bank Defs.' Mot. to Dismiss at 19.

negligent hiring or supervision.  Daisley's negligent hiring and supervision claim, however, must nonetheless be dismissed.  This is because the only underlying tort Daisley identifies, and the only injury he alleges for purposes of this claim, is his termination: "[h]ad Defendant Riggs brought in talented and competent individuals to collaborate with [Daisley] on CA$HLINK II, [Daisley] would still be employed at Defendant Riggs."  Compl. ¶ 198.  Daisley has not defeated the presumption that his employment with Riggs was at-will.  Because "no cause of action will lie for wrongful discharge of an employee subject to termination at will," *Buttell v. Am. Podiatric Med. Ass'n*, 700 F. Supp. 592, 600 (D.D.C. 1988), Daisley has not identified a legally cognizable tort resulting from Riggs' alleged negligence in failing to provide him with "talented and competent individuals" as supervisors or colleagues.  Compl. ¶ 198.  Consequently, his claim against Riggs for negligent supervision and hiring is dismissed.

### b. against Treasury

Daisley also brings a negligent hiring and supervision claim against Treasury.  Because the department "owed [Daisley] a duty to staff the project with individuals who possessed the requisite technical knowledge," *id*. ¶ 202, but instead "forced [Daisley] to deal with incompetent and malicious officials," *id*. ¶ 207, he contends that Treasury is legally responsible for his 'forced separation.'  *Id*. ¶ 209.

This claim likewise fails, because Daisley has not met his burden of establishing the court's jurisdiction.  *See McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 182-83 (1936); *Macharia v. United States*, 238 F. Supp. 2d 13, 19 (D.D.C. 2002); 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1214 (2d ed. 1990).  First, as federal defendants correctly note, the proper defendant is the United States, not Treasury.  Section 2679(a) of FTCA provides that the only appropriate defendant for Daisley's negligent supervision claim, a state tort action, is the United States.  *See, e.g.*, *Hagmeyer v. Dep't of Treasury*, 647 F. Supp. 1300, 1304-05 (D.D.C. 1986) (FTCA "directs that the exclusive remedy for common law tort claims is an action against the *United States* rather than against the individuals or the

27

particular governmental agencies").  Even if the court substituted the United States as the named

defendant in place of Treasury, this claim would be barred by the "discretionary function

exception" to FTCA.  28 U.S.C. § 2680(a).[13]  Under this exception, the federal government is

immune from liability for agents' decisions "that involve an element of judgment or choice."

*United States v. Gaubert*, 499 U.S. 315, 323 (1991).  The purpose of this exception is to "prevent

judicial 'second-guessing' of legislative and administrative decisions grounded in social,

economic, and political policy through the medium of an action in tort," *id.* (citations omitted).

Because "discretionary function determinations are jurisdictional in nature," *Cope v. Scott*, 45

F.3d 445, 448 (D.C. Cir. 1995), the court must dismiss a claim based on actions that fall under

this exception.

To determine whether the discretionary function exception applies, the court makes a

two-part inquiry.  First, if a federal statute, regulation, or policy "specifically prescribes" an

agent's act, "no discretion is employed and the only remaining inquiry . . . is whether the

employee did, or did not, do what was prescribed by the applicable statute, regulation, or policy."

*Macharia*, 128 F. Supp. 2d at 22 (citing *Cope*, 45 F.3d at 448).  Daisley has not indicated any

statutory, regulatory, or policy directive specifically prescribing guidelines for the hiring or

supervision of Treasury officials.  *See Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d

1207, 1217 (D.C. Cir. 1997) (reversing the district court's refusal to dismiss negligent

supervision, hiring, and training claims).  The court, therefore, considers a second question:

"whether the type of decision being challenged is grounded in social, economic, or political

---

[13]     28 U.S.C. § 2680(a) provides an exception to the government liability provided by the
FTCA for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or
perform a discretionary function or duty on the part of a federal agency or an employee of the
government, whether or not the discretion involved be abused."

policy." *Macharia v. United States*, 334 F.3d 61, 67 (D.C. Cir. 2003) (quoting *Cope*, 45 F.3d at 449).

In this circuit, federal government hiring and employee supervision decisions are generally held to "involv[e] the exercise of political, social, or economic judgment," and therefore, to fall within the scope of the United States' sovereign immunity. *Burkhart*, 112 F.3d at 1217; *see also Tonelli v. United States*, 60 F.3d 492, 496 (8th Cir. 1995) (dismissing a negligent hiring claim because "[p]ermitting FTCA claims involving negligent hiring would require this court to engage in the type of judicial second-guessing that Congress intended to avoid"); *Kirchmann v. United States*, 8 F.3d 1273, 1277 (8th Cir. 1993) (supervision of government contractors discretionary); *K.W. Thompson Tool Co. v. United States*, 836 F.2d 721, 728 (1st Cir. 1988) (training and supervision of federal agency personnel a permissible exercise of policy judgments). Hiring decisions by the federal government require considering a variety of factors such as "budgetary constraints, public perception, economic conditions, 'individual backgrounds, office diversity, experience and employer intuition.'" *Burkhart*, 112 F.3d at 1217 (quoting *Tonelli*, 60 F.3d at 496). Similarly, supervisory decisions require a "complex balancing of budgetary considerations, employee privacy rights, and the need to ensure public safety." *Id*.

Treasury's hiring and supervision decisions involving the assignment of employees to tasks associated with the CA$HLINK II project clearly fall under the discretionary function exception.[14] The exercise of judgment in hiring and supervising personnel, regardless of whether

---

[14] Plaintiff insists that the "highly detailed nature" of the CA$HLINK II project "removed a great deal" of McGuire's discretion, "render[ing] his role "more operational than discretionary." Opp'n (Fed. Defs.') at 8. This distinction, however, "has been expressly rejected by both the Supreme Court and the D.C. Circuit." *Loughlin v. United States*, 286 F. Supp. 2d 1, 26 (D.D.C. 2003) (citing *Gaubert*, 499 U.S. at 325) (other citations omitted). The discretionary function exception does not apply "exclusively to policymaking or planning functions," but also to "decisions made at the operational level." *Sloan v. Dep't of Housing and Urban Dev.*, 236 F.3d 756, 762 (D.C. Cir. 2001); *see also Cope*, 45 F.3d at 449 (noting that *Gaubert* "rejected a lower-court decision that relied upon a distinction between exempt 'planning' decisions and non-exempt 'operational' decisions.").

certain employees may have been more or less qualified for their positions, is within Treasury's discretion, and, therefore, "immune from suit for negligence in the performance of such functions." *Burkhart*, 112 F.3d at 1217.

       7.     **Accounting**

Finally, Daisley moves the court for an accounting of the financials of CA$HLINK II, ostensibly to "reclaim his professional reputation," Compl. ¶ 214, by showing that cost overruns occurred because of Roane's "negligent and malicious conduct" toward Daisley. *Id.* ¶ 212. Bank defendants argue that a party must assert entitlement to monies for which he seeks an accounting, and that Daisley has failed to do so. Bank Defs.' Mot. to Dismiss at 20 (citing *Rosenak v. Poller*, 290 F.2d 748, 750 (D.C. Cir. 1961)). Daisley offers no response to this statement. Accordingly, the court treats the issue as conceded and dismisses this claim. *See FDIC v. Bender,* 127 F.3d 58, 67-68 (D.C. Cir. 1997).

### III. CONCLUSION

For the foregoing reasons, the court concludes that federal defendants' motion to dismiss must be granted, and bank defendants' motion to dismiss must be granted in part and denied in part. An appropriate order accompanies this memorandum.

                           Henry H. Kennedy, Jr.
                           United States District Judge

Dated: May 31, 2005