UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ALEXANDER DAISLEY,

          Plaintiff,

v.

PNC BANK, N.A., et. al.

          Defendants.

Civil Action 03-01820 (HHK)

**MEMORANDUM OPINION**

Alexander Daisley brings this action against PNC Bank, N.A. ("PNC"), as successor to Riggs Bank, N.A. ("Riggs"), one of its officers, Robert Roane, and others, asserting various causes of action arising from the termination of Daisley's employment with Riggs in August 2001. Before the court is defendants' motion for summary judgment [# 47] as to Daisley's claims of breach of contract by Riggs and fraud by Roane.[1] Upon consideration of the motion, the opposition thereto, and the record of this case, the court concludes that the motion must be granted.

**I. BACKGROUND**

Before joining Riggs, Daisley was employed by Cap Gemini America ("CGA"), a business and technology consulting company that Riggs hired to assist with its bid to develop a Treasury Department cash management application known as CA$HLINK II. During the bidding process, Daisley became acquainted with Riggs senior executives Timothy Lex, its then-Chief

---

[1] These are the only claims that survived this court's ruling on May 31, 2005, granting, in part, defendants' motion to dismiss.

Operating Officer, and David Hoffman, its then-Chief Information Officer. Upon acceptance of its bid, Riggs solicited Daisley to leave CGA and join Riggs because of his expertise with "the new and recently enhanced cash management system" which Daisley was "instrumental in winning." Pl.'s Statement of Facts ¶¶ 4–5. Daisley was initially reluctant to leave his position with CGA but did so after Lex and Hoffman assured him that he would be guaranteed an "enhanced compensation package" ("ECP") including "a term of employment of not less than six years, an initial annual base salary of $200,000 with an annual bonus of up to 100% of the annual base salary, salary increases of up to 10% of [the] base salary, an initial allocation of 25,000 stock options and annual allocation of up to 10,000 stock options, if defined performance objectives were met." Id. ¶¶ 6, 16.

Before starting his employment, Daisley was presented with an offer letter "setting forth some, but not all, of the components of the verbal offers and commitments" he had previously received from Riggs' executives. Id. ¶ 18. The offer letter was signed on behalf of Riggs by Patti Yoder, Riggs' Human Resources Director, in order to "confirm [Riggs'] oral offer of employment," and provided that "[a]t all times while . . . employed by the Bank . . . [Daisley would] be employed 'at-will.'" Pl.'s Ex. O at 1–3 ("Offer Letter"). The offer letter specified that "[t]he 'at-will' nature of the employment relationship can only be changed by written agreement." Id. at 3. Additionally, the offer letter confirmed Daisley's starting salary of $200,000 and provided that Daisley would be eligible for a bonus of up to 100% of his annual base salary during his first year of employment "for exceeding agreed upon performance goals." Id. at 1. The offer letter further provided that "after [Daisley's] first year of employment an incentive plan [would] be developed incorporating revenue and profit goals and incentive

opportunities based on those goals," and that Daisley's salary would be "reviewed periodically, usually on an annual basis, to determine whether an adjustment should be made." *Id.* at 2. The offer letter also established that Riggs would "recommend to the Board of Directors" a stock option grant of 25,000 options, but specified that "Incentive Compensation payments are at the discretion of Riggs management." *Id.* The offer letter also stated, "[i]f there is any term of employment that we discussed that is not included in this letter, please contact [Patti Yoder, Riggs' Human Resources Director] immediately so we can include it." *Id.* at 3. Finally, a "Confidentiality and Non-Solicitation Agreement" was attached to the offer letter and provided that "[t]his agreement and [the] offer letter dated March 22, 1999 contains [*sic*] the entire agreement between you and the Bank as to your employment . . . . Any modifications to this Agreement must be made in writing and signed by both parties." Confidentiality and Non-Solicitation Agreement at 3.

Daisley signed the offer letter and the confidentiality and non-solicitation agreement with the understanding that his term of employment was for a minimum of six years and that Riggs would honor the terms of the oral ECP. He did not insist on incorporating all of the terms of the oral ECP into the offer letter "because he believed he would be working very closely" with the executives who initially made the offers to him and because "a trusted relationship between the individuals involved existed." Pl.'s Statement of Facts ¶ 20.

Daisley began working for Riggs on or about May 24, 1999, as Senior Vice President and as President of Riggs Enterprise Solutions. Within the first six months of Daisley's employment with Riggs, both Lex and Hoffman resigned. Roane replaced Lex as Chief Operating Officer and, upon Hoffman's departure from Riggs, Hoffman told Daisley that Roane would honor the

commitments made to him by Riggs executives. In at least two conversations regarding the oral representations made by Riggs executives, Roane told Daisley "if those were the commitments that were made to you I will honor those commitments." *Id.* ¶ 23.

In April 2000, Daisley was promoted to Executive Vice President, although his salary did not change. In June 2000, Daisley was awarded a bonus of 100% of his base salary for his 1999 performance, and around that time Daisley presented Roane with a memorandum outlining his personal performance goals for 2000. Daisley presented Roane with a similar memorandum in late February 2001 regarding his performance goals for 2001. Roane, however, subsequently informed Daisley that when he accepted the promotion he gave up his ECP. Riggs maintains that after Daisley's first year, his bonuses were to be determined under the General Incentive Plan, which allocates bonuses based on the performances of the employee and the company and, because Riggs did not perform well in 2000, no bonus payments were due to Daisley. Roane knew that when Daisley accepted the promotion to Executive Vice President he was losing his entitlement to his ECP and intentionally refrained from disclosing this information. Similarly, because Roane knew that Daisley would not continue to work for Riggs if he knew that his ECP would not be honored, Roane deliberately misled Daisley to believe that he and other Riggs employees were working to secure Daisley's ECP.

Daisley achieved all of his performance goals for 1999. Although Daisley received a 100% bonus for his 1999 performance, he received neither stock options nor a raise. Similarly, Daisley achieved all of his performance goals for 2000, but did not receive a bonus, stock options, or a raise for his 2000 performance. Daisley's ability to achieve his 2001 performance goals was frustrated by his termination from Riggs in late August 2001.

## II.   ANALYSIS

### A.   Summary Judgment Standard

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  The non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Liberty Lobby*, 477 U.S. at 248–49.  The non-moving party is "required to provide evidence that would permit a reasonable jury to find" in its favor. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 249–50.  "[W]here the facts as asserted [] are such that, if established, there could be no recovery . . . then the question becomes one of law for determination of the court and a proper matter for disposition by summary judgment." *Greyhound Corp. v. Excess Ins. Co. of America*, 233 F.2d 630, 636 (5th Cir. 1956).

B.   **Breach Of Contract**

1.   **The Oral Agreement And The Statute Of Frauds**

Defendants argue that because Daisley is "crystal clear that his alleged oral contract with Riggs was for a minimum six-year term," the alleged agreement comes within the statute of frauds because it is not capable of performance within one year. Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' Mem.") at 4. Thus, it is not enforceable.[2]

Daisley counters that defendants' statute of frauds defense is inapposite because the court already has held that he was employed at-will and not for a six-year term. Therefore, Daisley asserts, the question of Riggs' contractual obligation to compensate him with past-due bonus payments, stock options, and raises under the ECP is a separate issue from the previously-alleged six-year employment term. Daisley argues that this separate issue "tests whether a second subsidiary binding oral agreement actually exists." *Id.* at 5. Daisley maintains that such an agreement exists and is enforceable and therefore "the relevant issue for review at this point is whether [Daisley] achieved certain benchmarks or agreed-to performance standards that entitle him to claim and receive past due ECP benefits earned through his initial three years of employment at Riggs." *Id.* at 8. Daisley's position cannot be sustained.

To the extent that Daisley argues that prior to or contemporaneous with the creation of his written employment agreement, an enforceable "subsidiary" oral agreement regarding enhanced compensation was created, the argument is precluded by the rationale of this courts's prior ruling.

---

[2] D.C. Code § 28-3502 provides: "An action may not be brought . . . upon an agreement that is not to be performed within one year from the making thereof, unless the agreement upon which the action is brought, or a memorandum or note thereof, is in writing . . . and signed by the party to be charged therewith or a person authorized by him."

The court previously held that the offer letter was a completely integrated agreement, *see Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 2d 61, 69–70 (D.D.C. 2005), and "[w]hen parties to a contract have executed a completely integrated written agreement, it supersedes *all other understandings and agreements* with respect to the subject matter of the agreement between the parties, whether consistent or inconsistent." *Masurovsky v. Green*, 687 A.2d 198, 202 (D.C. 1996) (emphasis added) (citing *Howard Univ. v. Good Food Servs.*, 608 A.2d 116, 126–27 (D.C. 1992); *Ozerol v. Howard Univ.*, 545 A.2d 638, 641 (D.C. 1998)). Indeed, this court cautioned that a breach of contract claim regarding enhanced compensation, if based exclusively on an alleged oral agreement consummated prior to or contemporaneous with the offer letter, is not sustainable. *See Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 2d at 71 (holding that only Daisley's "remaining breach of contract claims regarding enhanced compensation, *based upon Riggs' alleged modification of the offer letter*, survive [] defendants' present motion [to dismiss]") (emphasis added). In sum, Daisley cannot allege any "subsidiary" agreement prior to the one memorialized in the offer letter[3] because the offer letter precludes such agreements.

### 2.   The Employment Agreement

Because the Employment Agreement precludes Daisley from relying on the prior oral agreement regarding enhanced compensation, the court must construe the Agreement to determine whether it is susceptible to the interpretation that Riggs had a contractual obligation to award Daisley enhanced compensation. It is not.

---

[3] Hereinafter, the court will refer to the agreement manifested in the offer letter as the Employment Agreement (or "EA").

"It is axiomatic that a promise to pay incentive compensation is unenforceable if the written terms of the compensation plan make clear that the employer has absolute discretion in deciding whether to pay the incentive." *O'Shea v. Bidcom, Inc.*, 2002 WL 1610942, at *3 (S.D.N.Y. July 22, 2002); *see Shahriary v. Teledesic, LLC*, 60 F. App'x 157, 162 (9th Cir. 2003) (affirming district court's finding that there was no contractual obligation to pay a bonus on a contract specifying that the employee would be "eligible to receive an annual bonus in the discretion" of the employer); *see also Miller v. Hekimian Labs., Inc.*, 257 F. Supp. 2d 506, 510, 514 (N.D.N.Y. 2003) (granting the defendant's motion for summary judgment with respect to the plaintiff's breach of contract claims because the contract stated that "benefits or incentive payments shall be at the discretion of the Board of Directors or the President of the Corporation or his designee"). Here, the EA vests full discretion with Riggs regarding any enhanced compensation awarded to Daisley, s*ee* Offer Letter at 2, and is therefore irreconcilable with the allegation that Riggs was contractually obligated to award Daisley bonus payments, stock options, and raises.

### 3.     The Lex Memo

Undeterred by either the EA itself or the court's prior decision regarding the integrated nature of the employment contract, Daisley argues that a confidential Riggs memorandum from Timothy Lex to then-CEO Joseph Allbritton, Pl.'s Ex. F ("Lex Memo"), establishes that he was guaranteed compensation under the terms of the oral ECP.[4]  Pl.'s Opp'n at 8.  Daisley maintains

---

[4] PNC points out that Daisley identifies the Lex Memo for the first time in his opposition brief and that, when asked at his deposition whether there were any documents that memorialized his alleged oral ECP, he identified only the offer letter. Defs.' Reply at 3.  However, in evaluating a motion for summary judgment, the court "may consider any material that would be admissible or usable at trial."  10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,

that the Lex Memo, which states that incentive compensation "would be linked to performance of CA$HLINK business," contradicts the assertion that the offer letter is the only document identified as memorializing the terms of the parties' agreement. *Id.* According to Daisley, the Lex Memo proves that he was hired pursuant to the terms of the oral ECP. *Id.* The Lex Memo, however, is dated 10 days prior to the offer letter, and therefore meets the same fate as the alleged oral agreement: it is superseded by the completely integrated EA. *See Masurovsky*, 687 A.2d at 202.

      Daisley's apparent belief that the Lex Memo prevents construing the EA as a completely integrated agreement is, of course, misguided. And even were the Lex Memo's broad language regarding incentive compensation somehow read to undermine the completely integrated nature of the EA, the Lex Memo would not help Daisley because it does not oblige Riggs to honor the terms of the alleged oral ECP or otherwise provide Daisley any guaranteed enhanced compensation. In Daisley's best possible scenario, the EA is partially integrated, but as such, its contents supersede inconsistent terms of prior agreements. *See Ozerol*, 545 A.2d at 641. An attempt to construe the Lex Memo's broad language that incentive compensation would be linked to CA$HLINK performance as a guarantee regarding incentive compensation is inconsistent with Riggs' discretion under the EA to award incentive compensation. *See* Offer Letter at 2. Accordingly, Daisley cannot establish, by allegations of a subsidiary oral agreement, by interpreting the EA, or by relying on the Lex Memo, that Riggs had a contractual obligation to award him enhanced compensation.

---

*Federal Practice and Procedure* § 2721 (3d ed. 1998); *see also Kendrick v. Sullivan*, 766 F. Supp. 1180, 1192 (D.D.C. 1991).

9

### 4.    Ratification Of The Oral Agreement/Modification Of The Employment Agreement

Daisley next argues that the alleged oral agreement regarding enhanced compensation is enforceable — that is, that the oral agreement somehow overrides Riggs' discretion regarding enhanced compensation under the EA — because it was ratified after the initial agreement was created. He alleges that ratification occurred "in any or all of the following ways:"

> (1) Roane's statement to Daisley "if those were the commitments that were made to you, I will honor those commitments," (2) Roane's approval of a $200,000 bonus (consistent with the terms of [Daisley's] ECP "employment agreement" and from an account titled "Guaranteed Bonus") and (3) during [Daisley's] deposition when counsel for [] Roane stated in relevant part:
> Q: After you were promoted he [Roane] gave you your $200,000 bonus, did he not?
> A: Yes.
> Q: So he honored that part of the agreement, did he not?

Pl.'s Opp'n at 12 (internal citations omitted). Daisley seems to contend that ratification of the oral agreement constitutes modification of the offer letter. While there may be some merit to the reasoning underlying this claim, the court concludes that the oral agreement was not ratified.

A contract is ratified "when a party recognizes its validity by acting under it or by affirmatively acknowledging it." *Liberto v. D.F. Stauffer Biscuit Co.*, 441 F.3d 318, 325 (5th Cir. 2006) (applying Texas law); *see also Catex Vitol Gas, Inc. v. Wolfe*, 178 F.3d 572, 577 (1st Cir. 1999) (finding that in order for an oral modification to be enforceable it must be "sufficiently definite to supply the terms of a valid contract").[5] Here, Roane's statement to Daisley that "*if*

---

[5] Although the confidentiality and non-solicitation agreement that was attached to the offer letter provides that "[a]ny modifications to this Agreement must be made in writing and signed by both parties," Confidentiality and Non-Solicitation Agreement at 3, "a written contract may be modified or rescinded by a subsequent oral agreement, even where the contract contains express language prohibiting oral modification." *Puma v. Sullivan*, 746 A.2d 871, 875 (D.C. 2000) (citations omitted).

those were the commitments that were made to you, I will honor those commitments," Pl.'s Opp'n at 12 (emphasis added), cannot establish ratification of the oral agreement because Roane's statement is conditioned on the truth of the commitments that Daisley claimed were represented to him. As defendants correctly point out, "[t]here is no evidence in the record to establish that Roane's quoted words are anything more than a statement that he would look into the matter, and Roane's willingness to investigate the matter does not amount to a ratification of Daisley's alleged oral contract." Defs.' Reply at 7.

Similarly, neither Roane's approval of the $200,000 bonus following Daisley's first year of employment nor his counsel's statement during deposition that payment of the bonus "honored [] part of the agreement" support ratification of the oral agreement. Under the terms of the offer letter, Riggs could — in its discretion — award Daisley a bonus of up to 100% of his base salary. *See* Offer Letter at 1. Thus, the $200,000 bonus is consistent with the terms of the EA and, therefore, establishes nothing regarding any separate oral agreement. *See id.* Similarly, Daisley's argument that the statement by counsel for Roane (but not Roane himself) constitutes a ratification of some kind is unpersuasive. There is no evidence that the alleged oral agreement regarding enhanced compensation was ratified, or that Riggs' discretion pursuant to the EA regarding such compensation was modified.[6]

---

[6] The court could theorize that the EA was modified by Daisley's promotion, or that, consistent with the offer letter's provision that "after [Daisley's] first year of employment an incentive plan will be developed," Offer Letter at 2, a new incentive plan was established and altered the terms of the offer letter. Daisley, however, does not raise these issues, and there is no evidence in the record supporting any contract modification via promotion or incentive plan development.

Accordingly, because Daisley cannot establish that Riggs had a contractual obligation to compensate him under the alleged oral ECP, and because no evidence supports ratification of any contradictory oral agreement or modification of the EA, the court grants summary judgment as to Daisley's breach of contract claim.[7]

### C.   Fraud

Daisley also asserts a claim of fraud, alleging that Roane promoted him to Executive Vice President with knowledge that while the move "appeared to be a promotion on the surface . . . it was in reality a demotion for [Daisley] in that it materially and adversely impacted the terms of [his] enhanced compensation package." Compl. ¶ 174. According to Daisley, as a direct result of this promotion, he "lost his entitlement to his 100% annual bonus of $220,000 for year two" of his employment with Riggs. *Id.* ¶ 175.

"To be entitled to a trial on the merits of a fraud claim, a plaintiff must allege 'such facts as will reveal the existence of all the requisite elements of fraud. Allegations in the form of conclusions on the part of the pleader as to the existence of fraud are insufficient.'" *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 923 (D.C. 1992) (quoting *Bennett v. Kiggins*, 277 A.2d 57, 59–60 (D.C. 1977)). The common law elements of fraud are "(1) a false representation (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation," and "at least in cases involving commercial contracts negotiated at arm's length there is the further requirement (6) that the defrauded party's reliance be *reasonable*." *Id.* Daisley rightly points out that

---

[7] Defendants argue in the alternative that Daisley's breach of contract claim is time-barred by the statute of limitations. *See* D.C. Code § 12-301 (1981). Because the court finds that the oral agreement is unenforceable, the court does not address this defense.

"[n]ondisclosure or silence, as well as active misrepresentation, may constitute fraud," Pl.'s Opp'n at 17 (quoting *Bennett*, 377 A.2d at 59), especially where "a court finds that a party had the duty to disclose material information, and failed to do so." Pl.'s Opp'n at 17 (quoting *Sage v. Broad. Publ'ns Co.*, 997 F. Supp. 49, 52 (D.D.C. 1998)).  According to Daisley, whether Roane had a duty to disclose the material facts regarding compensation with respect to Daisley's promotion depends upon whether Daisley and Roane were in a fiduciary relationship.  Pl.'s Opp'n at 16.  Relying on *Firestone v. Firestone*, 76 F.3d 1205, 1211 (D.C. Cir. 1996), Daisley asserts that it is inappropriate, in evaluating a motion for summary judgment, to resolve the question of whether a fiduciary relationship between him and Roane existed because it is a "fact-intensive question."  Pl.'s Opp'n at 17.

It is unnecessary for the court to follow Daisley down this road to trial because he has put forward no evidence that he suffered damages arising from the alleged fraud.  "In order to state a claim for common law fraud, the plaintiff must allege that the fraud caused him damage." *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 793 (D.C. Cir. 1983) (citations omitted); *see* 27 Richard A. Lord, Williston on Contracts § 69:53 (4th ed. 1990) ("It is, of course, essential to the right of action [for fraud] that some damage shall have been suffered").  Similarly, "damages are restricted in all cases to such damages as were the natural and proximate consequences, or the direct consequences, of the fraud, and to such damages as can be clearly defined and ascertained." *Naartex*, 722 F.2d at 793 (citations and internal quotation marks omitted).  Accordingly, "it is elementary that speculative damage will not support an action for common law fraud."  *Id.* at 793 n.22 (citations and internal quotation marks omitted).

Here, Daisley maintains that Roane knew and failed to disclose that when Daisley "changed his title from Senior Vice President to Executive Vice President, that [he] would no longer be entitled to his ECP." Pl.'s Opp'n at 18. On that basis, Daisley asserts that he lost his 100% bonus for year two of his employment with Riggs. Compl. ¶ 175. Daisley again mistakes Riggs' discretion regarding enhanced compensation for a guarantee. As discussed above, Riggs had no contractual obligation to provide Daisley with enhanced compensation. Whether or not Daisley was promoted, Riggs maintained discretion with respect to Daisley's entitlement to incentive compensation. *See* Offer Letter 2. Roane's silence could not have cost Daisley his bonus because, even if he remained a Senior Vice President, he was not guaranteed any enhanced compensation. Thus, the notion that Daisley lost his ECP due to the promotion is speculative.

Because Daisley cannot establish damage resulting from Roane's silence, the court grants summary judgment as to Daisley's fraud claim.

### D.     Daisley's Remaining Attempts To Avoid Summary Judgment

Finally, Daisley argues that summary judgment should not be granted because there is doubt as to the historical facts and because the credibility of both defendants is at issue. Pl.'s

Opp'n at 19–21.[8]  The court is not persuaded.

With respect to the breach of contract claim, after all inferences are drawn in Daisley's favor, he still is unable to establish that Riggs was bound by the terms of the oral agreement regarding the ECP because the oral agreement cannot, as a matter of law, supplant Riggs' discretion regarding enhanced compensation.  Similarly, with respect to the fraud claim, he cannot show that he suffered damage as a result of the alleged fraud because Riggs maintained discretion with respect to Daisley's entitlement to enhanced compensation.  Moreover, Daisley's contention that defendants' silence and obstructionist behavior during deposition hampered his ability to establish genuine issues of material fact regarding ratification of the ECP and/or modification of the EA is unpersuasive.  Any evidence of a modification to the offer letter, or the existence of a contract term that calls into question Riggs' discretion to award enhanced compensation would not be within the exclusive control of defendants — that is, because he was a necessary party to any such agreement or modification, Daisley would have known about it and could have produced evidence to support his allegations.

---

[8] The evidence supporting these contentions includes the following:  (1) during his deposition, Roane stated "no less than 67 times 'I don't know' or 'I can't recall' even when very simple questions are posed."  Pl.'s Opp'n at 19–21 (citing Pl.'s Ex. I at 43 (Dep. of Roane)); (2) Daisley asks the court to compare Roane's deposition, where he stated that "when [Daisley] became an EVP, the terms of his compensation did not change because of that promotion," Pl.'s Ex. I at 14–16, with the testimony of Riggs corporate spokesperson Bill Craig, who stated "if you're an EVP, you're entitled to the bonuses that are designed for EVP's.  I mean, what you were prior is not relevant," Pl.'s Ex. P at 27 (Dep. of Craig); and (3) Daisley asserts that Riggs' corporate spokesperson "has no clue about simple matters and could not even speak to basic questions" and that defendants' responses to Daisley's discovery requests were "sparse."  Pl.'s Opp'n at 21 (citing Pl.'s Ex. P at 9).

### III.  CONCLUSION

For the foregoing reasons, the court grants defendants' motion for summary judgment.

An appropriate order accompanies this memorandum opinion.

Henry H. Kennedy, Jr.<br>
United States District Judge

Dated: July 16, 2007